**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM HARTZELL,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 21-1873-KSM** |
| **ADAPTABLE SYSTEMS CORP.,** | |
| Defendant. | |

**<u>MEMORANDUM</u>**

**MARSTON, J.**                                                **May 11, 2022**

Plaintiff William Hartzell brings claims against his former employer, Adaptable Systems Corporation, doing business as Corporate Payroll Services, for violations of the Families First Coronavirus Response Act ("FFCRA"), the Fair Labor Standards Act ("FLSA"), and the Family and Medical Leave Act ("FMLA"). In essence, Hartzell argues that Adaptable Systems misled him about his right to leave under the FFCRA and terminated him when he was unable to telework while caring for his daughter, who was attending virtual school from home. Before us is Adaptable Systems's Motion for Summary Judgment (Doc. No. 26). For the reasons discussed below, that motion is denied.[1]

## I.   FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Hartzell, the relevant facts are as follows.

---

[1] Adaptable Systems also filed a motion to dismiss. (Doc. No. 20.) Because the motion for summary judgment raises almost identical arguments to the motion to dismiss, we focus on this later motion and the evidence in the record.

Adaptable Systems hired Hartzell as an outside sales representative for its Pennsylvania office on March 2, 2020.  (Doc. No. 31-13 at ¶ 2.A; *see also* Doc. No. 26-9 at ¶ 4.)  Approximately two weeks later, the COVID-19 pandemic dramatically changed life in the United States, and Adaptable Systems, like many companies, directed its employees to begin teleworking.  (Doc. No. 31-13 at ¶ 16.)  Per the company's teleworking policy, Hartzell and other sales representatives were required to make around 60 sales calls per hour.[2]  (*See* Doc. No. 26-9 at ¶ 4; Doc. No. 31-2 at 10:9–14.  *But see* Doc. No. 31-4 at 16:17–17:3 (Fierle testifying that the call requirement was 20 to 30 calls per hour); Doc. No. 31-11 (email from Fierle to Hartzell saying, "Try to hit about 25–30 calls an hour and keep pushing to keep people on the phone if you can.").)  While Hartzell was adjusting to these changes at work, Pennsylvania Governor Tom Wolf issued an executive order requiring schools to transition to remote learning, and Hartzell's eleven-year-old daughter and his fiancée's teenage son began virtually attending classes from home.  (Doc. No. 31-2 at 9:17–10:3, 25:3–9.)

## A.      *Hartzell Speaks with Sales Manager Frank Fierle*

In the days that followed, Hartzell struggled to meet his call quota while also caring for his daughter,[3] and on April 8, 2020, he emailed his supervisor, Sales Manager Frank Fierle, about his options.  (Doc. No. 31-11 (email from Hartzell telling Fierle, "There is no possible way for me to be able to perform my work and take care of family at the same time.  Do you know what I can do?  Is this something I should reach out to George [Sebastian] about?").)  Fierle called Hartzell that morning to reiterate that he needed to be making the required calls.  (Doc.

---

[2] The call quota appears to have been a new requirement, implemented because the sales representatives were forced to work from home instead of going door-to-door as they had before.

[3] Although Hartzell was engaged at the time and living with his fiancée and her son, he was the sole caregiver for his daughter and did not share those responsibilities with his fiancée.  (Doc. No. 31-2 at 25:21–26:2.)

2

No. 31-4 at 23:10–15; *see also* Doc. No. 31-10 (transcript of their conversation).)  Hartzell explained his family situation and asked Fierle about a poster published by the United States Department of Labor that the company's Human Resources Director, George Sebastian, had sent out the week before.  (*See* Doc. No. 31-3 at 29:22–30:8; Doc. No. 31-10 ("William [Hartzell]: I'm wondering if I am covered under the CARES Act or the number 5 that they sent out."); *see also* Doc. No. 31-9 (email from Sebastian to all employees circulating the "notice of employee rights from the Department of Labor for the Families First Coronavirus Response Act (FFCRA)").)

The poster is titled, "Employee Rights," and it states that the "Families First Coronavirus Response Act (FFCRA or Act) requires certain employers to provide their employees with paid sick leave and expanded family and medical leave for specified reasons related to COVID-19." (Doc. No. 31-6.)  The poster then lists six "qualifying reasons" that would entitle an employee to leave, including if he or she is unable to telework because they are caring for a child:

> An employee is entitled to take leave related to COVID-19 if the employee is unable to work, including unable to **telework**, because the employee . . . 5. Is caring for his or her child whose school or place of care is closed (or child care provider is unavailable) due to COVID-19 related reasons . . . .

(*Id.*)  According to the poster, an employee who falls within this fifth category is entitled to "[u]p to two weeks of fully or partially paid sick leave" and an additional 10 weeks of "expanded family and medical leave paid at 2/3 . . . for up to $200 daily and $12,000 total."  (*Id.*)

Fierle knew nothing about the poster or Hartzell's rights and directed him to Sebastian. (Doc. No. 31-2 at 13:13–17, 13:22–14:4; Doc. No. 31-4 at 22:22–23:9, 29:4–30:6.)

**B.**     ***Hartzell Speaks with Sebastian***

A couple of hours after Hartzell's conversation with Fierle, Sebastian called Hartzell to discuss his lack of productivity.  Sebastian began by noting that Hartzell had not made any

outbound calls all morning.  (Doc. No. 31-12 at 0:18.)  Hartzell responded that he has "two kids and everybody is working from home," and that he could not meet the call quota "under these circumstances."  (*Id.* at 0:33 (Hartzell telling Sebastian, "It's just kind of bad timing. . . .  I was here for two weeks and then I got basically sent home and, you know, just cold calling people, but I have a whole house here you know I got kids to take care of it's just kind of distracting . . . ."); *see also* Doc. No. 31-10 (Hartzell telling Fierle, "I mean it's just, it's just crazy what's happening obviously . . . .  I know there's nothing we can do at this point, but like I said I just . . . with the kids and stuff like that everybody here at home is trapped in here, it's, I don't have a big house[.  W]e live in like a little twin.").)  And he asked Sebastian about the poster:  "I am reading the poster that we got sent out a week ago, I guess it was, and I was wondering if I fit under . . . any of the circumstances here."  (Doc. No. 31-12 at 0:33.)  At first, Sebastian seemed confused by the request:

> George Sebastian:  Um, circumstances as far as like the uh the paid sick leave?
>
> 1:18 – William Hartzell:  Yeah, I guess.  I mean, I'll be honest with you, George.  I'm shocked I'm even here.  Like you know, and it's nobody's fault.  I don't blame the company or anyone personally.  I mean, it's just bad timing.  I mean this is crazy what's going on.  So, you know, I know some people were getting laid off and I just assumed that I'd be one of them and you know I get it it's like I said bad timing.  But I've been home.  I have been trying to make the calls, but I feel like we got hit like before you guys did.[4]   And everything is closed and you know like I said I am dealing with kids running around here.  They need food. . . .  They got schooling and homework and stuff, and . . . I've been trying to make the calls, but I am also like making them lunch in between like trying to dial a number here or two, and . . . it's just getting kind of crazy up here, so I am wondering if I fit under I guess number 5 of the thing.

---

[4] Hartzell worked out of the company's Philadelphia office, while Sebastian worked out of the Atlanta, Georgia office.

(*Id.* at 1:18; *see also* Doc. No. 31-3 at 54:7–19 (Sebastian conceding that Hartzell's reference to

"number 5" "may have been" a reference to number five on the FFCRA poster).)  Sebastian

asked for further clarification:

> 2:12 – George Sebastian:  So wait.  When you say 'number 5', are you talking about the, um, the paid sick leave?  Or like the FMLA, or are you talking more about like the CARES Act?
>
> 2:22 – William Hartzell:  I thought it was the CARES Act to be honest with you.  I mean that's—
>
> 2:26 – George Sebastian:  Well I mean the CARES Act talks about you know um the unemployment laws.  They are a little bit more flexible, and then you know you apply for unemployment, and then you get $600 dollars above what you would normally get for unemployment.  Um the EFMLA and the EPFL um that has to do with paid . . . uh . . . Normally you wouldn't get time off, but you wouldn't get paid for sick leave.  That says if you get paid for your sick leave up to two weeks, up to 80 hours of time.  But that would mean that would require that you get diagnosed with like COVID 19 or like you know somebody in your family.
>
> William Hartzell:  Yeah, that was like the first three numbers, right?
>
> George Sebastian:  Yeah.

(Doc. No. 31-12 at 2:12–2:26; Doc. No. 31-3 at 54:20–55:4 (Sebastian conceding that he was the

first one to mention the CARES Act); *id.* at 57:21–58:3 (Sebastian explaining that he believed a

COVID-19 diagnosis was "required" to receive leave).)

Sebastian then turned away from the poster and expressed his sympathy for Hartzell's

situation, telling him, "I mean, I totally get what you are saying, though.  I mean it's just the

timing of it all, and for me as HR, I have had the same discussion with a lot of people, you know,

and they tell me the same thing."  (Doc. No. 31-12 at 2:26.)  And he encouraged Hartzell, "At the

end of the day, if you don't feel like you haven't [sic] accomplished anything, you know

something's not right.  I totally get it.  I totally understand."  (*Id.*)  Hartzell then reiterated his

frustrations teleworking during the pandemic:

William Hartzell:  I was shocked like because we've been doing this for three weeks, you know, everything is closed.  Like there's nobody around and obviously that's who I'm calling up here um you know obviously when I got hired, telemarketing wasn't my forte.  I guess I am a door knocker. . . .  I have been trying to do it, but obviously I am not getting much luck getting like reaching through to people.

George Sebastian: . . . .  It was totally understandable.  It was kind of like an overload especially for somebody who hasn't been here a long time. . . .  I totally get it, and that's kind of why I was asking Frank you know kind of coach him you know so he's not too shocked into it. . . .  But you know at the end of the day man I totally get it if . . . you're not doing something you are not [sic] passionate about I totally get it.

William Hartzell:  Nah, I would have loved to have like a fair shot at this . . . .  I don't want to just quit obviously, you know, but I am reading these things.  Like I said, I got kids. . . .  My kids got schooling now.  Like they are doing it all online and stuff like that, and you know I got to kind of be there to help them make sure they're on and they're doing it and make sure things are getting done here.  Obviously, they need to feed.  They go outside.  I got to make sure they are social distancing from the neighbor's kids and stuff like that, but I am still like required to sit here and make phone calls . . . .  [M]e and Frank had a conversation about making a certain amount and I am just not really able to get there like with kind of everything that's going on.

(*Id.* at 2:26.)  Sebastian explained Hartzell's options:

George Sebastian:  [T]hat's fair, man.  What I can do on my end is . . . after . . . we take any kind of like employment actions we include notes in there everything like eligibility for rehire and eligibility to reapply and things like that.  I will put a note in there that once the situation is a little bit better you know um once we start restructuring the position to be back in the office and everything . . . if you are open and still okay with it, I can reach back out to you[. T]here is really not much flexibility on our end either . . . .

7:15 – William Hartzell:  No, no, I understand. . . .  [W]hen it all kinda happened back in like March 11th[,] 12th at least in Philadelphia while I was at home, I'm like well you're done here . . . and I was grateful that you did keep me to be honest with you um and I felt being home alright maybe we can make this work.  It's just it's just not working out like, you know, at least making the volume of phone calls that they're looking for, I guess.

6

(*Id.* at 2:26–7:15.)  At this point, the conversation turned toward wrapping up Hartzell's

employment, including returning company equipment and filing for unemployment:

> George Sebastian:  Yeah, no I totally understand that. . . .  I will ask,
> um, Frank to . . . swing by your place . . . so that way we can collect
> the IPAD and . . . I will send your separation notice and all that stuff
> . . . digitally to you.
>
> 8:28 – William Hartzell:  So you will not fight me on unemployment
> at this point?  Cause I know it's still going to get a bit complicated.
> I don't even think I've been here long enough . . . for it to go off of
> you guys.  I've been here 4 weeks maybe.
>
> 8:39 – George Sebastian:  Yeah, yeah, so yeah I don't, I don't think
> um you qualify, but again, you know, Philadelphia it's one of those
> things where it's almost like a guaranteed thing now especially with
> the pandemic going on and everything like that, and. . . you have to
> earn at least I think, um, $7,900 or something like that in um, uh,
> Pennsylvania, but I'll, um, I'll, I'll fill out that form for you and I'll
> send it to you and um you can . . . reach out to me directly . . . .

(*Id.* at 7:15–8:39.)  The two men ended the call with Sebastian telling Hartzell, "I'm sorry it

didn't work out man."  (*Id.* at 10:13.)

### C.   *Sebastian's Follow Up Emails*

A few minutes after his conversation with Hartzell, Sebastian sent an email to Fierle and

other managerial employees summarizing the call.  (Doc. No. 31-7.)  After explaining that

Hartzell was struggling to meet his call quota while also caring for his children, Sebastian states,

"[H]e felt that the fair thing for both of us was for him to look into whether he qualifies for any

of the provisions under the CARES act or FFCRA.  I outlined my FFCRA eligibility matrix and

communicated that he does not qualify without himself or someone close to him being diagnosed

or at risk of contracting COVID-19."  (*Id.*)  Sebastian then recounted Hartzell's questions about

unemployment and summarized his own response as, "I told him each state is different and

[unemployment insurance] was already in favor of the employee in PA and the new legislation

7

only makes it more favorable for the employee and that we review each case before deciding how to proceed." (*Id.*)

Sebastian also sent a follow-up email to Hartzell. (Doc. No. 31-13 at ¶ 3.) He thanked Hartzell for his "honesty and feedback during the discussion today," and conceded that "[i]t is fair what you said about the distractions with the kids and significant other being at home." (*Id.*) Sebastian then referenced Hartzell's request, "When you asked about qualifying for the CARES Act, I didn't have it pulled up in front of me to give you the exact provisions that were relevant: Please see the link below as Title III has all of the Labor Provisions." (*Id.*) The web link leads to a copy of the Senate bill that became the CARES Act. (*See id.* (citing https://www.congress.gov/bill/116th-congress/senate-bill/3548/text).) Last, Sebastian reminded Hartzell that Fierle would contact him about collecting work equipment and that he should send his work passcodes and final expense report to Sebastian. (*Id.*)

In response to Sebastian's email, Hartzell said, "I really do hope that when this pandemic is resolved, that you will reach out to me if you are hiring. Stay safe." (*Id.*)

### D.     *Hartzell Applies for Unemployment*

After Hartzell left Adaptable Systems, he applied for unemployment with the Pennsylvania Department of Labor ("DOL"). (Doc. No. 31-2 at 28:10–14.) As part of his application, Hartzell completed a claimant questionnaire. (*Id.* at 29:8–11; *id.* at Ex. C.) The questionnaire asked whether he "quit [his] job or t[ook] a leave of absence." (Doc. No. 31-2 at 29:24–30:7; *see also id.* at Ex C.) Because Hartzell believed he had not been offered a leave of absence and because his application could not be processed unless he checked off one of the two boxes, Hartzell checked the box beside the word "quit." (Doc. No. 31-14 at ¶¶ 3–7 (explaining that he tried calling the DOL but could not reach anyone and "[a]fter trying to get through to the DOL for several days, [he] checked off the only box that [he] could in order for [his] application

8

for unemployment compensation to get processed during the pandemic"); *see also* Doc. No. 31-2 at 29:24–30:7; *id.* at Ex C.)  However, in the section asking him to "explain the reason [he] quit [his] job," Hartzell said:  "Covid 19[.]  I told employer I have to watch my child who's [sic] school closed[.]  I brought up CARES Act and was told to go to unemployment."  (Doc. No. 31-2, Ex. C; *see also id.* ("Had a phone call with HR Rep and was told to go on unemployment[.] Explained situation about child care.").)  At the end of the questionnaire, Hartzell certified that "the information [he] provided is true to the best of [his] knowledge."  (*Id.* at 30:19; *see also id.* at Ex. C.)  During his deposition, Hartzell conceded that he was incorrect when he said he quit his job.  (*Id.* at 31:12–18.)

Hartzell temporarily received unemployment, but his claim was later denied when the DOL found that he voluntarily quit his job.  (*Id.* at 27:13–28:14.)  Hartzell appealed this decision, and in the box labeled "Determination Disagreement" explained that he filed for unemployment at the suggestion of Sebastian:

> I started my position on 03/03/2020.  I was in training for 3 weeks before being sent to work from home.  My job title was outside sales rep selling payroll to small business.  I was supposed to get 2 to 3 appointments a day to close sales.  When I was sent home, the job was now a telemarketing position.  I was required to make 60 calls [per] hour.  At the same time my daughter[']s school closed due to COVID 19.  I was unable to make the amount of calls [r]equired and take care of my daughter[']s needs (virtual classes, lunch, making sure she was social distancing outside).  I explained this to the HR representative, George S[e]basti[a]n, and asked to go on the Family First Coronavirus Response Act, where you were able to receive 2/3rd the employee[']s regular rate for up to 10 weeks.  He said he completely understood and unemployment would be best since unemployment benefits now had an extra $600 available.  I agreed and was sent an email regarding this conversation.  I did not quit.

(*Id.* at Ex. D.)

Hartzell was not represented by an attorney during the unemployment compensation hearings.  (*Id.* at 28:19–22.)  According to Hartzell, if he had been advised of his eligibility for

leave under the FFCRA, he would have taken that leave and never would have pursued unemployment.  (*Id.* at 68:22–69:6; *see also id.* at 69:13–14 ("Q: Did you ever intend to quit? A: No.").)

### E.    *Hartzell Files this Action*

Hartzell filed this action on April 22, 2021.  (Doc. No. 1.)  In the First Amended Complaint, Hartzell alleges that Adaptable Systems violated his rights under the FFCRA, the FLSA, and the FMLA when Sebastian misled him about his entitlement to leave, discouraged him from seeking leave, failed to compensate him for his qualifying leave, and terminated him in retaliation for requesting leave under the FFCRA.  (Doc. No. 7 at ¶ 33.)  He asserts three counts: (1) Wrongful termination and retaliation under the FFCRA and the FLSA (Count I); (2) interference and retaliation under the FFCRA and FMLA (Count II), and (3) unpaid wages under the FFCRA and FLSA (Count III).

Adaptable Systems moves for summary judgment on all three counts.[5]  (Doc. No. 26.)  Hartzell opposes the motion.  (Doc. No. 31.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the

---

[5] As mentioned above, *see supra* n.1, Adaptable Systems's motion for summary judgment raises similar arguments to those raised in its motion to dismiss.  (*Compare* Doc. No. 20, *with* Doc. No. 26.) The Court focuses on the motion for summary judgment.

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

## III.   DISCUSSION

Adaptable Systems argues that it is entitled to summary judgment on each count of Hartzell's First Amended Complaint. (Doc. No. 26.) Before turning to its substantive arguments, however, the Court must first address its assertion that Hartzell is judicially estopped from claiming he was fired.

### A.   *Estoppel*

Adaptable Systems argues that Hartzell is judicially estopped from arguing that he was terminated because in his application for unemployment benefits, he indicated that he "quit" his position at Adaptable Systems. (Doc. No. 26 at p. 8.)

Judicial estoppel is an equitable doctrine that "bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).  For the doctrine to apply, the party requesting estoppel must show that three conditions are met.  "First, the party to be estopped must have taken two positions that are irreconcilably inconsistent." *Id*.  "Second, judicial estoppel is unwarranted unless the party changed his or her position 'in bad faith—i.e., with intent to play fast and loose with the court.'" *Id.* (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996)).  Third, judicial estoppel must be "'tailored to address the harm identified,'" and the court must find that "no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Id.* at 779–80 (quoting *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999)).  Adaptable Systems has failed to show that any of these conditions are satisfied here.

### 1.    Irreconcilably Inconsistent Positions

First, the Court questions whether Hartzell's current argument—that Adaptable Systems terminated him—is inconsistent with the assertions he made in his initial application.  Adaptable Systems focuses on Hartzell's claimant questionnaire, where he checked the box indicating that he "quit [his] job." (*See* Doc. No. 26 at p. 8.)  Were this evidence viewed in a vacuum, the Court would agree that Hartzell's assertion that he "quit" is at odds with his current argument that he was terminated.  But the Court must consider Hartzell's assertion *in context*. *See Ocasio v. Ollson*, 596 F. Supp. 2d 890, 903–04 (E.D. Pa. 2009) ("Plaintiff has not asserted a position in this Court which is contrary to nor inconsistent with the description of his injuries that was contained in the [Compromise and Release Agreement ("C&R")].  To constrain Plaintiff to the limited injury claims that Defendants suggest would require the Court to ignore important language contained in the C&R and would also require the Court to consider the language of the

12

C&R in a vacuum. . . .   Reading the C&R as a whole, it is evident that Plaintiff has not maintained an inconsistent position in this litigation, especially considering the circumstances at the proceedings before the Workers' Compensation Court."); *cf. Motley v. N.J. State Police*, 196 F.3d 160, 167 (3d Cir. 1999) ("Motley, relying on several specific and severe physical injuries, asserted that he was 'permanently and totally disabled.'  This was not a mere blanket statement of complete disability checked on a box in order to obtain pension benefits.  Rather, the assertion was supported by Motley's additional statements concerning the type and extent of his injuries.  Furthermore, the medical board diagnosis, uncontested by Motley, also concluded that Motley was permanently incapacitated for police officer duties.  On their face, these assertions are patently inconsistent with his present claims that he was a 'qualified individual' under the ADA.").

Viewing the claimant questionnaire in context, we find it relevant that the questionnaire gave Hartzell only two options—he had to indicate *either* that he "quit [his] job" or that he "t[ook] a leave of absence."  (Doc. No. 31-2, Ex C.)  Notably, "terminated" was not an option.  In addition, later in the questionnaire, in the section asking Hartzell to "explain the reason [he] quit [his] job," Hartzell made the same factual assertions that he makes here:  "Covid 19[.]  I told employer I have to watch my child who's [sic] school closed[.]  I brought up [the] CARES Act *and was told to go to unemployment*."  (*Id.* (emphasis added).)  Hartzell reiterated this same explanation throughout the questionnaire.  (*See id.* ("Had a phone call with HR Rep and *was told to go on unemployment*[.]  Explained situation about child care." (emphasis added)).)  And when he appealed the DOL's decision to deny his application, Hartzell explicitly disputed that he had quit:  "I was unable to make the amount of calls [r]equired and take care of my daughter[']s needs . . . .  I explained this to the HR representative, George S[e]basti[a]n, and asked to go on

the [FFCRA.]  He said he completely understood and unemployment would be best since unemployment benefits now had an extra $600 available.  I agreed and was sent an email regarding this conversation.  *I did not quit.*"  (*Id.* at Ex. D (emphasis added).)

Because Hartzell's statements before the DOL are not "irreconcilably inconsistent" with his arguments in this case, judicial estoppel is inappropriate.  But even assuming that Hartzell's two statements are inconsistent, judicial estoppel would still be inappropriate in this case because Adaptable Systems cannot merely show that the two statements are inconsistent.  It must also show that Hartzell took those inconsistent positions in bad faith and that estoppel is necessary to protect the court's integrity.  Neither condition is met here.

### 2.    **Bad Faith**

As to the second condition, we cannot find that Hartzell acted in bad faith for at least two reasons.  First, as is clear from our previous discussion, on the claimant questionnaire, Hartzell was required to select either the box indicating that he "quit" or the box indicating that he took a "leave of absence."  Hartzell testified that he tried contacting the DOL for clarification on this issue but was unable to get through to the agency given the flood of calls to state unemployment agencies during the first few weeks of the pandemic.  Without guidance, and forced to select one of the two boxes for his application to be processed, Hartzell chose the box indicating that he "quit" his position and then explained his situation in the application's narrative section.  Given Hartzell's circumstances, we cannot find that he acted in "bad faith."  *See Baier v. Jersey Shore State Bank*, No. 4:07-CV-2236, 2009 WL 2843325, at *8 (M.D. Pa. Aug. 31, 2009) (finding no bad faith because although the defendant argued on appeal in an unemployment compensation matter that the plaintiff was terminated for cause—a position at odds with its argument in this later litigation that the plaintiff resigned—the defendant was "essentially forestalled" from raising a contrary argument during the appeal:  "At that point, [the defendant] could either

14

handcuff itself to the [Board]'s decision and argue in favor of its validity, as one would expect, or permit plaintiff's appeal to proceed unopposed.  We find it incredibly unreasonable to punish [the defendant] for selecting the former, especially since we hardly consider the latter a legitimate option.").

Second, we cannot find bad faith because, as Hartzell points out, he was ultimately unsuccessful in seeking unemployment benefits.  The Third Circuit has held that it "does not constitute bad faith to assert contrary positions in different proceedings when the initial claim was never accepted or adopted by a court or agency."  *Montrose Med. Grp. Participating Sav. Plan*, 243 F.3d at 781; *see also Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir. 1992) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." (cleaned up)).  In other words, the party must "succeed[ ] in maintaining [its prior] position" for judicial estoppel to apply.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) (explaining that judicial estoppel "generally prevents a party from *prevailing* in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase" (emphasis added)); *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 487 (3d Cir. 2013) ("Judicial estoppel thus does not apply here because [the plaintiff] did not obtain a benefit from the arguments it made in the District court.  The arguments it made did not prevail in any meaningful sense [because t]he District Court instead granted summary judgment to [the defendant].");  *Montrose Med. Grp. Participating Sav. Plan*, 243 F.3d at 778 ("Because the earlier statements in this case were never accepted or adopted, judicial estoppel was inappropriate.").  Here, although Hartzell was initially granted unemployment benefits, the DOL ultimately denied his application.  (*See*

Doc. No. 31-2 at 27:13–28:14.)  Therefore, Hartzell did not "succeed" or obtain a benefit from

the arguments he made before the DOL, and Adaptable Systems has failed to show that Hartzell

acted in bad faith.[6]

### 3.    Miscarriage of Justice

Finally, under the third condition, the Third Circuit has described judicial estoppel as "an

extraordinary remedy"—"often the harshest remedy"—"that should be employed only when a

party's inconsistent behavior would otherwise result in a miscarriage of justice."  *Id.* at 784

(cleaned up).  Accordingly, a district court may invoke the doctrine only when "(1) no sanction

established by the Federal Rules or a pertinent statute is up to the task of remedying the damage

done by a litigant's malfeasance; and (2) the sanction of judicial estoppel is tailored to address

the harm identified." *Id.* (cleaned up).  Here, because Hartzell did not benefit from his arguments

before the DOL, the Court finds that no miscarriage of justice will result in allowing Hartzell to

argue that he was terminated.  *See New Hampshire*, 532 U.S. at 750–51 ("Absent success in a

prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court

determinations, and thus poses little threat to judicial integrity."); *MD Mall Assocs., LLC.*, 715

---

[6] As this discussion demonstrates, the law on this issue is clear:  a party acts with bad faith for purposes of judicial estoppel only when he or she prevails before the underlying tribunal.  Here, it is undisputed that Hartzell was unsuccessful in his request for unemployment compensation.  Given this, it should have been immediately apparent to defense counsel that Hartzell did not act in bad faith, and thus, judicial estoppel is inappropriate in this case.  Nevertheless, defense counsel not only pursued a theory of judicial estoppel, he also boldly stated that "Mr. Hartzell played fast and loose with the Court" because the Department of Labor adopted Mr. Hartzell's position that he quit."  (Doc. No. 26-1 at p. 10.)  Defense counsel is the only one playing "fast and loose with the Court," and this clearly misplaced judicial estoppel argument leads the Court to question both his candor and his credibility.  *See* 204 Pa. Code § 3.3(1) ("A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."); *Fischer & Porter Co. v. Tolson*, No. CIV. A. 91-7822, 1993 WL 427351, at *2 (E.D. Pa. Oct. 19, 1993) ("An attorney has an obligation of candor to the court.  Model Rules of Professional Conduct Rule 3.3(3) (1983).  Although this rule specifically refers to an attorney's obligation to disclose controlling precedent to the court, it necessarily applies as well to the disclosure of material facts and 'any development which may conceivably affect an outcome of the litigation.'" (quoting *In re Universal Minerals v. De le Puente*, 755 F.2d 313, 313 (3d Cir. 1985))).

F.3d at 487 ("In this case, [the plaintiff] did not benefit from its inconsistent position in the District Court, and no miscarriage of justice would result from our entertaining the argument it now advances on appeal.").

* * *

In sum, Adaptable Systems has failed to satisfy any of the elements for judicial estoppel. Estoppel is inappropriate, and the Court will not foreclose Hartzell from asserting that he was terminated from Adaptable Systems.

### B.    The FFCRA Claims

With the factual dispute resolved, we turn now to Adaptable Systems's substantive arguments for summary judgment.  Because Counts I, II, and III are brought, in part, under the FFCRA, we begin with a brief explanation of the Act, its purpose, and its connection to the FLSA and FMLA.

Congress passed the FFCRA in March 2020, as the COVID-19 pandemic began to take hold in the United States.  "Broadly speaking . . . the FFCRA obligates employers to offer sick leave and emergency family leave to employees who are unable to work because of the pandemic."  *New York v. U.S. Dep't of Labor*, 477 F. Supp. 3d 1, 5 (S.D.N.Y. 2020).  "The purpose of the FFCRA is to provide relief to American workers and to promote public health." *Jones v. E. Airlines, LLC*, Civil Action No. 20-1927, 2021 WL 2456650, at *4 (E.D. Pa. June 16, 2021) (quotation marks omitted); *see also Gracia v. Law Officers of Alexander E. Borell, P.A.*, 535 F. Supp. 3d 1268, 1270–71 (M.D. Fla. Apr. 19, 2021) (explaining that the "broad purpose" of one portion of the FFCRA is to "obviate the pressure on employees 'to choose between their paycheck and their health'" (quoting 166 Cong. Rec. H.1675-09, H1689 (daily ed. Mar. 13, 2020) (statement of Rep. Scott)))).

Two divisions of the FFCRA are at issue here.  The first is titled the "Emergency Paid Sick Leave Act" (the "EPSLA").  Under the EPSLA, an employer is required to "provide to each employee . . . paid sick time to the extent that the employee is unable to work (or telework) due to a need for leave because [t]he employee is caring for a son or daughter [and] the school or place of care of the son or daughter has been closed, or the child care provider of such son or daughter is unavailable, due to COVID-19 precautions."  FFCRA § 5102(a)(5), 134 Stat. 195 (2020); *see also Piotrowski v. Signature Collision Ctrs., LLC*, Case No. 2:21-cv-02115-JDW, 2021 WL 4709721, at *1 (E.D. Pa. Oct. 8, 2021) (explaining that the EPSLA requires "covered employers to provide employees who are unable to work or telework with up to eighty hours of paid sick leave due to a variety of reasons related to COVID-19").  An employer who fails to pay wages to a qualifying employee as required by § 5102 of the EPSLA is "considered to have failed to pay minimum wages in violation of section 6 of the FLSA (29 U.S.C. § 206)."  FFCRA § 5105(a)(1), 134 Stat. 197 (2020).

The EPSLA also renders it "unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee, who—(1) takes leave in accordance with this Act; and (2) has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . or has testified or is about to testify in any such proceeding."  FFCRA § 5104, 134 Stat. 196 (2020).  If an employer violates § 5104, it may be subject to liability under the enforcement provisions of the FLSA.  Specifically, if an employer "willfully violates section 5104" it is "considered to be in violation of [§ 215(a)(3)] of the Fair Labor Standards Act" and the employer may be "subject to the penalties described" in §§ 216 and 217 of the FLSA.  FFCRA § 5105(b), 134 Stat. 197 (2020).

The second division of the FFCRA that is relevant here is titled the "Emergency Family and Medical Leave Expansion Act" ("EFMLEA").  The EFMLEA expanded entitlement to leave under the FMLA, entitling "an eligible employee . . . to a total of 12 workweeks of leave during any 12-month period . . . because of a qualifying need related to a public health emergency in accordance with section 2620 of this title."  29 U.S.C. § 2612(a)(1)(F).  Section 2620, in turn, broadens the definition of "eligible employee," to include any "employee who has been employed for at least 30 calendar days by the employer," and it defines "qualifying need related to a public health emergency" to mean "the employee is unable to work (or telework) due to a need for leave to care for the son or daughter under 18 years of age of such employee if the school or place of care has been closed, or the child care provider of such son or daughter is unavailable, due to a public health emergency."  *Id.* § 2620(a)(2)(A).  A violation of the EFMLEA is a violation of the FMLA.

As this review shows, an employee who was "unable to work (or telework) due to a need for leave to care for a son or daughter," whose school closed because of COVID-19, would have qualified for leave under both the EPSLA and the EFMLEA.  In that case, the two-week EPSLA period runs concurrent with the twelve-week EFMLEA period, and the employee is entitled to twelve total weeks of pay at a rate of 2/3 her regular rate.  *See Jones*, 2021 WL 2456650, at *6 ("Generally when an employee qualifies for leave under both Acts, an employee may first use the two weeks of paid leave provided by the EPSLA.  This use runs concurrent with the first two weeks of unpaid leave under the EFMLEA.  Any remaining leave taken for this purpose is paid under the EFMLEA." (quoting 85 Fed. Reg. 19,337 (Apr. 6, 2020))); *see also* FFCRA § 5110(5)(B)(ii), 134 Stat. 200 (2020) ("[W]ith respect to any paid sick time provided for any use described in paragraph (4), (5), or (6) of section 5102(a), the employee's required

19

compensation . . . shall be two-thirds" of the "employee's regular rate of pay"); 29 U.S.C. §

2620(b) ("The first 10 days for which an employee takes leave under section 2612(a)(1)(F) of

this title [i.e., the EFMLEA] may consist of unpaid leave," and the "employer shall provide paid

leave," in an "amount that is not less than two-thirds of an employee's regular rate of pay" for

"each day of leave under section 2612(a)(1)(F) of this title that an employee takes after taking

leave under such section for 10 days").

     With this framework in mind, we address Adaptable Systems's arguments as to each

count in turn.

     **1.**    <u>**Count I: Wrongful Termination and Retaliation Under the EPSLA and FLSA**</u>

     In Count I, Hartzell claims that Adaptable Systems violated the EPSLA and FLSA when

it fired him in retaliation for requesting leave.  (Doc. No. 7 at p. 7.)  "The appropriate framework

for analyzing claims of unlawful retaliation under the FLSA is the familiar burden-shifting

framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Cononie v.

Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002); *see also Wadley v. Nat'l Railway

Equip. Co.*, __ F. Supp. 3d __, 2021 WL 5405225, at *6 (W.D. Ky. Nov. 17, 2021) ("And

because the EPSLA relies on the Fair Labor Standards Act ('FLSA') for its enforcement

provisions, courts use the FLSA *McDonnel-Douglas* framework to evaluate EPSLA claims.")

(collecting cases).  Under this framework, the employee bears "the initial burden of establishing

a *prima facie* case of retaliation" by showing:  "(1) protected employee activity; (2) adverse

action by the employer either after or contemporaneous with the employee's protected activity,

and (3) a causal connection between the employee's protected activity and the employer's

adverse action."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quotation marks

omitted).  "If the employee establishes a prima facie case of retaliation, the burden of production

shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse

employment action." *Id.* "If the employer meets its burden, the burden of production returns to

the employee, who must now show, by a preponderance of the evidence, that the employer's

proffered explanation was false, and that retaliation was the real reason for the adverse

employment action." *Id.* (quotation marks omitted).

Adaptable Systems contends that it is entitled to judgment in its favor on Count I because

Hartzell cannot show that he engaged in protected activity or that he was subject to an adverse

employment action.  (Doc. No. 26 at pp. 12–16.)  We address each issue in turn.

### a. Protected Activity

Adaptable Systems argues that it is entitled to judgment on Count I because Hartzell did

not engage in a protected activity under § 5104 of the EPSLA—i.e., he did not "take[ ] leave"

under the EPSLA or "file[ ] any complaint or . . . proceeding under or related to this Act."  (Doc.

No. 26 at p. 13.)  Adaptable Systems reasons that because Hartzell merely *requested* leave—as

opposed to actually taking leave—he did not engage in a protected activity.  (*Id.*)  Hartzell

responds that if we accept Adaptable Systems's argument, it "would render the anti-retaliation

provisions of the FFCRA meaningless."  (Doc. No. 31-1 at pp. 16, 20.)

One court in this District recently addressed this issue in an unpublished opinion.  *See

Piotrowski*, 2021 WL 4709721, at *3.  In *Piotrowski*, the plaintiff, who had Type-1 diabetes and

a suppressed immune system, requested leave from his employer under the EPSLA.  *Id.* at *1.

The employer rejected the plaintiff's request and ultimately fired him for having "abandoned his

position."  *Id.*  The plaintiff filed suit, arguing among other things that the employer failed to

provide leave as required by §5102 of the EPSLA and retaliated against him for requesting leave

in violation of § 5104.  *Id.* at *2. On the employer's motion to dismiss, the court found that the

plaintiff pleaded "a plausible claim for violation" of § 5102, which requires employer to provide

paid sick leave for employees who are unable to work because of one of the six enumerated reasons. *Id.* at *2–3.  However, the court dismissed the employee's retaliation claim under § 5104.  *Id.* at *3.  It rejected the plaintiff's argument that "his 'request and attempt' to take leave under the EPSLA [wa]s sufficient in light of the Act's 'remedial and humanitarian purpose.'"  *Id.* The court reasoned that "[o]n its face, the EPSLA requires a plaintiff to take both steps—(1) take leave *and* (2) file a complaint or institute a proceeding—in order to assert a retaliation claim," but in this case, the employee had failed to satisfy either step.  *Id.* at *4 (emphasis added); *see also id.* ("Even if the Court were certain that Congress did not mean to impose a conjunctive requirement, the Court would not be free to disregard Congressional language in a quest to serve a Congressional purpose.  And the Parties have done nothing to demonstrate that Congress did not intent to impose the requirement that it imposed as part of the EPSLA.").

Adaptable Systems argues that *Piotrowski* supports its position here.  Hartzell, meanwhile, attempts to distinguish *Piotrowski*, arguing that controlling Third Circuit case law requires a more lenient reading of § 5104's text.  Having considered the parties' arguments and the reasoning in *Piotrowski*, we see two issues of statutory interpretation that must be decided. First, we must decide whether an employee must meet both subparts of § 5104 to show that he or she engaged in protected activity, as the *Piotrowski* court found.  Second, if an employee need satisfy only one of the two subparts, we must consider what it means to "take" paid sick leave under the FFCRA, and in particular, whether that phrase encompasses a request for leave when the employee is fired before he can actually commence leave.

### i.       Conjunctive/Disjunctive Interpretation

In interpreting § 5104, we begin with the text of the statute.  *See United States v. Diallo*, 575 F.3d 252, 256 (3d Cir. 2009) ("The role of the courts in interpreting a statute is to give effect

to Congress's intent.  Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." (cleaned up)).  As a reminder, § 5104 reads:

> It shall be unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who—
>
> (1) takes leave in accordance with this Act; and
>
> (2) has filed any complaint or instituted any proceeding that seeks enforcement of this Act, or has testified or is about to testify in any such proceeding."

FFCRA § 5104.  The *Piotrowski* court found that this text was not ambiguous and that the phrase "and" must be read in the conjunctive as requiring the employee to satisfy both (1) and (2) above.  We agree that this is the most straightforward reading of the statute.  However, we find another interpretation equally plausible.

First, we find it telling that Congress used an em dash after § 5104's opening phrase and placed § 5104(1) and § 5104(2) in distinct, enumerated provisions.  Federal courts in other Circuits have found that "the presence of an em dash before a list in statutory language indicates that the word or phrase preceding the dash should be distributed to modify each of the succeeding list items individually."  *United States v. Howell*, 2021 WL 2000245, at *3 (C.D. Ill. May 19, 2021); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) (interpreting a provision that referred to any person who "knowingly—(A) reproduces any child pornography . . . or (B) advertises, promotes, presents" a "visual depiction of a minor engaging in sexually explicit conduct," 18 U.S.C. § 2252A(a)(3), and finding that "the first word of § 2252A(a)(3)—'knowingly'—applies to both of the immediately following subdivisions . . . § 2252A(3)(A) and . . . § 2252A(a)(3)(B)"); *cf. Mitchell*, 343 F.3d at 829 ("Section 2611(4)(A) [of the FMLA] commences with 'The term employer—' and follows with four clauses

addressing what the term 'employer' 'means' and 'includes.'  The use of an em dash following

'employer' indicates that clauses (i), (ii), (iii), and (iv) modify the term 'employer.'" (citations

omitted).).  Likewise, the use of enumerated subparts suggests that each subpart should be

viewed as a distinct provision; *id.* at 830 ("[I]n accordance with the plain text's separation of the

clauses into distinct provisions, the structure of Section 2611(4)(A) patently demonstrates that

the individual liability provision and public agency provision are separate and distinct.").

Applying this grammatical understanding to § 5104, we find it equally reasonable to read

that section as prohibiting an employer from discriminating against "any employee who takes

leave in accordance with this Act" *and* "any employee who has filed any complaint or instituted

any proceeding that seeks enforcement of this Act or, has testified or is about to testify in any

such proceeding."  When read this way, a qualifying employee need show only that he or she

satisfies either § 5104(1) or § 5104(2).

This broad reading is consistent with the Department of Labor's regulations

implementing § 5104, which view taking leave and instituting proceedings as separate protected

acts:

> Prohibited acts.  An Employer is prohibited from discharging,
> disciplining, or discriminating against any Employee because such
> Employee took Paid Sick Leave under the EPSLA.  Likewise, an
> Employer is prohibited from discharging, disciplining, or
> discriminating against any Employee because such Employee has
> filed any complaint or instituted or caused to be instituted any
> proceeding, including an enforcement proceeding, under or related
> to the EPSLA, or has testified or is about to testify in any such
> proceeding.

29 C.F.R. § 826.150(a) (Apr. 2, 2020).  And although few district courts have analyzed this issue

in depth, we note that most of the courts applying § 5104 have found that an employee may bring

a claim for retaliation where his or her employer took an adverse employment action against the

employee for *either* taking leave *or* instituting proceedings.  *See, e.g.*, *Figuero Collazo v.*

24

*Ferrovial Construcción PR, LLC*, Civil No. 20-1612 (DRD), 2021 WL 4482268, at *4 (D.P.R.

Sept. 30, 2021) ("[F]ailing to provide the paid leave under EPSLA is a violation to federal wages

under the FLSA.  Furthermore, any discrimination as to the employee taking said leave, *or* filing

and/or participating in a complaint related thereto, is a violation of the anti-retaliation provision

contained in the FLSA." (emphasis added)); *Colombe v. SGN, Inc.*, No. 5:20-CV-374-REW,

2021 WL 1198304, at *3 & n.6 (E.D. Ky. Mar. 29, 2021) (explaining that "Colombe must show

(based on her allegations) that she took leave under the EPSLA to establish the 'protected

activity' prong of the FFCRA retaliation claim" and noting that the "other types of protected

conduct" are "fil[ing] a complaint or institut[ing] a proceeding related to the EPSLA or

testif[ying] in such an enforcement proceeding"); *see also, e.g.*, *Johnson v. Gerresheimer Glass*

*Inc.*, No. 21-cv-4079, 2022 WL 117768, at * 4 (N.D. Ill. Jan. 12, 2022) ("[T]he plain language of

§ 5104 requires an employee to perform a certain activity—here, 'tak[ing] leave in accordance

with' the EPSLA—to recover for retaliation." (quoting FFCRA § 5104(1)); *Haddon v. Jesse*

*Stutts, Inc.*, Case No. 5:20-cv-01830-HNJ, 2021 WL 3089232, at *3 (N.D. Ala. July 22, 2021)

("The EPSLA also prohibited employers from 'discharging, disciplining, or in any other manner

discriminating against any employee who takes leave in accordance with this Act.'" (quoting

FFCRA § 5104(1)) (alterations adopted).); *Gracia*, 535 F. Supp. 3d at 1270 ("Additionally, an

employer cannot 'discharge, discipline, or in any other manner discriminate against' an

employee who 'takes leave in accordance with this Act.'" (quoting FFCRA § 5104(1))).  Indeed,

the Court has found no case where an employee brought an EPSLA retaliation claim after

engaging in *both* protected acts, suggesting that the narrow reading adopted in *Piotrowski* would

render § 5104's protections virtually meaningless.

In addition, we imagine few employees would take leave or institute proceedings if they knew that their employer could, without consequences, fire them in retaliation for doing so. *See Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 455 (1989) ("Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention . . . ."). As the Middle District of Florida succinctly put it: "The Act strives to shield employees from COVID-19-related discrimination—not insulate employers from EPSLA lawsuits." *Gracia*, 535 F. Supp. 3d at 1272.

Having reviewed the text of § 5104, the Department of Labor's implementing regulations, and the opinions of other district courts, we decline to follow *Piotrowski* and find that an employee asserting a retaliation claim need show only that he or she engaged in protected activity under either § 5104(1) or § 5104(2).

### ii.        What It Means to "Take" Leave

Because it is sufficient for Hartzell to assert that he was fired for taking leave, we must next determine what it means to "take" leave. Hartzell argues that the phrase encompasses a situation, like the one here, where he requested leave but was fired before he could commence leave. Adaptable Systems disagrees, arguing that the statute's use of the phrase "took leave" unambiguously requires Hartzell to have gone out on leave before being fired. District courts across the country are split on this issue.[7] In light of a Third Circuit opinion in the FMLA context, we feel compelled to follow the broader approach.

---

[7] *Compare Piotrowski*, 2021 WL 4709721, at *3 (rejecting the employee's argument that "his 'request and attempt' to take leave under the EPSLA is sufficient in light of the Act's 'remedial and humanitarian purpose'") *and Colombe*, 2021 WL 1198304, at *3 (holding that the EPSLA's retaliation provision "does not extend to requests for or attempts at leave") *with Gracia*, 535 F. Supp. 3d at 1269 (broadly interpreting § 5104 and finding that an employee could bring a retaliation claim where she was fired one day after she requested leave but before the leave commenced) *and Kofler v. Sayde Steeves*

In *Erdman v. Nationwide Insurance Company*, an employee brought a claim against her former employer for FMLA retaliation under a regulation that prohibited employers from discriminating against "employees who have used FMLA leave." 582 F.3d 500, 508 (3d Cir. 2009) (citing 29 C.F.R. § 825.220(c) (Jan. 15, 2009)). The employer argued that the employee had not "used FMLA leave" because she had only requested leave under the FMLA but was fired before the leave actually commenced. *Id.* at 509 (arguing that "because the regulation protects 'employees who have used FMLA leave,' . . . an employee cannot establish a retaliation claim unless she actually commenced leave"). The Third Circuit disagreed, emphasizing that "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability by firing the employee before the leave begins." *Id.* at 508. "Simply put, this Court has never held that an employee fired after requesting FMLA leave but before the leave begins cannot recover for retaliation" and to hold as much would "allow a[n] employer to limit an FMLA plaintiff's theories of recovery by preemptively firing her." *Id.* at 509. To avoid the absurdity of such a result, the Third Circuit interpreted "the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave," and it held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights *as well as retaliation against the employee*." *Id.* at 509. (emphasis added).

Although the court in *Erdman* interpreted an FMLA regulation and here we analyze a provision of the EPSLA, given the factual similarities between the two cases, the fact that the two provisions invoke nearly identical language, and the broad remedial purpose of both the

---

*Cleaning Serv., Inc.*, 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020) ("Kofler has plausibly alleged that she engaged in protected activity under the FLSA *by requesting FFCRA leave*." (emphasis added)).

FMLA and the FFCRA, we believe *Erdman* governs our analysis. Applying that ruling here, we interpret § 5104's requirement that an employee "took leave," to encompass a situation, like the one before us, where the employee requested leave under the EPSLA but was fired before that leave commenced.[8]

* * *

With this interpretation of § 5104 in mind, the Court finds that Hartzell has shown that he engaged in protected activity because he requested leave under the EPSLA.

### b.  Adverse Employment Action

In the alternative, Adaptable Systems argues that even if we reject its interpretation of § 5104, we must still dismiss Count I because Hartzell did not suffer an adverse employment action. (Doc. No. 26 at p. 15.) This argument rests on Adaptable Systems's assertion that Hartzell voluntarily resigned from his position. In addition to the judicial estoppel argument rejected above, the company argues that "[n]o reasonable jury could review the transcript and conclude that Mr. Hartzell did not quit his position with Adaptable Systems." (*Id.* at p. 16.) We strongly disagree.

A reasonable juror, viewing the evidence in the light most favorable to Hartzell, could find that Hartzell was terminated when Sebastian chastised Hartzell for not meeting his call quota, told him he was not entitled to leave, mentioned unemployment, and encouraged him to pursue that route instead. *See Simone v. Harborview Rehab. & Care Ctr. at Doylestown, LLC,* Civil Action No. 20-3551, 2021 WL 2291341, at *5 (E.D. Pa. June 4, 2021) (denying summary judgment in FFCRA interference case because "there is a question of material fact regarding

---

[8] Because we find the Third Circuit's holding in *Erdman* controlling on this issue, we do not repeat the lengthy statutory interpretation analysis discussed above. Nevertheless, we remain mindful of the remedial purpose of the FFCRA, which supports a broad reading of the phrase "took leave."

whether [the employee] was fired or quit" during a call with his supervisor where the employee

testified that he told his supervisor he could not "keep working without proper PPE" and the

supervisor testified that he interpreted the conversation as the employee resigning).  Because

there is a dispute of fact about whether Hartzell was terminated during his call with Sebastian,

summary judgment is inappropriate on this issue.

* * *

In sum, Hartzell has put forth evidence to support a prima facie claim for retaliation

under § 5104.  Because Adaptable Systems has not even attempted to put forth a legitimate, non-

discriminatory reason for terminating him, we deny Adaptable Systems's request for summary

judgment as to Count I.

### 2. Count II: Interference and Retaliation Under the EFMLEA and FMLA

In Count II, Hartzell claims that he sought and was entitled to leave under the EFMLEA,

that Adaptable Systems interfered with his rights under the EFMLEA when it misled and

misinformed him about those rights, and that Adaptable Systems retaliated against him for

requesting EFMLEA leave by terminating his employment during the call with Sebastian.  (Doc.

No. 7 at ¶¶ 53–55.)  Adaptable Systems moves for summary judgment on this Count, arguing

that Hartzell has put forth no evidence to support a claim for interference or retaliation.[9]

#### a. Interference

"An FMLA interference claim arises under 29 U.S.C. § 2615(a)(1), which makes it

'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under' the FMLA."  *Capps v. Mondelez Glob., LLC*, 147 F. Supp. 3d

---

[9] As we mentioned above, the EFMLEA expanded entitlement to leave under the FMLA, such that a violation of the EFMLEA is a violation of the FMLA.  Therefore, we rely on the law discussing FMLA interference and retaliation in analyzing Hartzell's claims.

327, 334 (E.D. Pa. 2015) (quoting 29 U.S.C. § 2615(a)(1)).  To prove a claim of FMLA

interference, Hartzell must show that:  (1) he "was an eligible employee under the FMLA,"

(2) Adaptable Systems was "an employer subject to the FMLA's requirements," (3) he "was

entitled to FMLA leave," (4) he "gave notice to the defendant of his or her intention to take

FMLA leave," and (5) he was "denied benefits to which he . . . was entitled under the FMLA."

*Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014).  "An interference action is not about

discrimination[;] it is only about whether the employer provided the employee with the

entitlements guaranteed by the FMLA."  *Capps*, 147 F. Supp. 3d at 334 (quoting *Callison v. City

of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005)).

Here, the first three elements are not in dispute—Hartzell was an eligible employee;

Adaptable Systems was a qualifying employer; and Hartzell was entitled to leave under the

EFMLEA because he was unable to telework while taking care of his daughter.  Adaptable

Systems argues that Hartzell cannot show that he gave notice of his intent to take leave or that

Adaptable Systems withheld benefits to which he was entitled.  (Doc. No. 26 at pp. 16–17.)

### i.     Notice

A reasonable juror viewing all the evidence in the light most favorable to Hartzell could

find that he gave adequate notice of his need for EFMLEA leave.  *See Lichtenstein v. Univ. of

Pittsburgh Med. Ctr.*, 691 F.3d 294, 303 (3d Cir. 2012) (explaining that the "critical test" for

notice is "not whether the employee gave every necessary detail to determine if the FMLA

applies, but 'how the information conveyed to the employer is reasonably interpreted,'" and

"[h]ow the employee's notice is reasonably interpreted is generally a question of fact, not law"

(quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007)); *see also id.*

at 307 ("A trier of fact considering" the question of notice is "entitled to consider the totality of

the circumstances . . . ." (question marks omitted)); *Sarnowski*, 510 F.3d at 402 ("In providing

notice, the employee need not use any magic words.  The critical question is how the information

conveyed to the employer is reasonably interpreted.  An employee who does not cite to the

FMLA or provide the exact dates or duration of the leave requested nonetheless may have

provided his employer with reasonably adequate information under the circumstances to

understand that the employee seeks leave under the FMLA.").

Hartzell told Sebastian and Fierle that he needed leave because he could not telework

while also caring for his daughter who was attending virtual school because of COVID-19.  That

is sufficient.  *See Payne v. Wood Servs., Inc.*, 520 F.3d 670, 675 (E.D. Pa. 2021) ("When 'giving

notice of the need for FMLA leave,' the employee must 'state a qualifying reason for the needed

leave'" such that the employer can "'determine whether the leave qualifies under the Act.'"

(quoting 29 C.F.R. § 825.301)); *see also Lichtenstein*, 691 F.3d at 303 ("As we have previously

noted, this is not a formalistic or stringent standard."); *cf. Sarnowski*, 510 F.3d at 403 ("Indeed,

where courts have found notice to be deficient, it has been because the employee failed to

convey the reason for needing leave.").

Notably, Hartzell not only stated his need for leave and the reason with specificity but

*also* explicitly and repeatedly referenced paragraph 5 of the FFCRA poster that Sebastian had

circulated to all employees.  *See Rashid v. Sovereign Bancorp, Inc.*, Civil Action No. 07-1056,

2008 WL 2485450, at *6 (E.D. Pa. June 19, 2008) ("Rashid testified at his deposition that, at the

September 19, 2006 meeting, he requested that he be granted leave to care for his sick mother

who was having health problems and would need a medical procedure.  Because this evidence is

sufficient to permit a reasonable jury to find in Rashid's favor on the question of notice, there is

a genuine issue of material fact and summary judgment must be denied.").

Adaptable Systems argues that Hartzell's notice was insufficient because he mentioned the wrong statute.  It reasons that because Hartzell referenced the CARES Act by name, Sebastian did not have notice that Hartzell wanted to take leave under the EFMLEA.  We find this argument unavailing for two reasons.  First, it is detrimental to Adaptable Systems's argument that *Sebastian* mentioned the CARES Act first.  A reasonable juror could find that Hartzell was entitled to rely on Sebastian's understanding of who qualifies for leave under these Acts.  Second, as discussed above, Hartzell told Sebastian that he was looking for leave, not unemployment compensation, because he needed to care for his daughter and specifically referenced paragraph 5 of the FFCRA poster that Sebastian himself circulated.[10]  A reasonable juror could find that Sebastian, as the Director of Human Resources, should have known that Hartzell was pursuing his remedies under the FFCRA, not the CARES Act.  Indeed, after his call with Hartzell, Sebastian sent a summary email to other members of management, explaining he had discussed Hartzell's options under the CARES Act *and the EFMLEA*, suggesting that Sebastian knew Hartzell was asking about his right to leave under EFMLEA.

For those reasons, we cannot find that Hartzell gave inadequate notice.

---

[10] Hartzell consistently testified that he thought the CARES Act encompassed the leave he was requesting and explained that he did not know it was limited to unemployment.  (Doc. No. 31-2 at 18:8–14 (explaining that he thought he was entitled to leave under the CARES Act but he "didn't know what the name of the actual act was"); *id*. at 21:3–16 ("I believe that the CARES Act was kind of everywhere, you know, like—you know, that's what everybody—it was the big talk, everybody knew—you know, that was the one—I never heard of the—well, other than—I just assumed it was the CARES Act, to be honest.  I didn't know the name of it, I didn't know—I just knew the poster they sent me and I didn't know what the name of the bill was or really what it was, and that's why I was inquiring about it."); *id*. at 49:19–50:5 ("A: . . . I didn't actually say the Family First Coronavirus Act, I did not say that [in the conversation with Sebastian].  Q: You said a different act, you said the CARES Act; correct?  A: I believe the—I thought they were the same thing at the time, yes."); *id*. at 72:12–19 ("Q: Okay.  And you would agree with me that you had mentioned the CARES Act on multiple occasions during that conversation?  A: That's what I—I'm sorry if that's what you meant by—like, I agree that this is the conversation, but, obviously, reading it, I had the CARES Act confused with the Family First Coronavirus Act."); *see also* Doc. No. 31-14 ("Although I referred to the 'CARES Act' in the Questionnaire (and at other times) I was confusing that law with the FFCRA.").)

ii.     *Denial of Benefits*

Questions of fact also foreclose a ruling on whether Adaptable Systems denied Hartzell

benefits to which he was entitled under the FFCRA when Sebastian misled Hartzell about his

entitlement to leave and terminated him.  Although Adaptable Systems denies that anything

Sebastian said was misleading, [11] a reasonable juror could find that Sebastian misled Hartzell

when he told Hartzell, incorrectly, that Hartzell would qualify for leave only if he or someone in

his family was diagnosed with COVID-19.  Telling a qualifying employee that he does not

qualify for leave could certainly discourage or inhibit the employee from exercising his rights.

*See Capps*, 147 F. Supp. 3d at 335 ("In order to assert a claim of interference, an employee must

show that he was entitled to benefits under the FMLA and that his employer illegitimately

prevented him from obtaining those benefits." (quoting *Sarnowski*, 510 F.3d at 401)); *Wright v.*

---

[11] Notably, Joseph Beverly, President of Adaptable Systems since 1984, testified that Sebastian "misspoke" when he told Hartzell that he or someone in his family had to be diagnosed with COVID to receive leave:

> Q: Okay.  Just continuing on though at 2:26, I just want to read the rest of that paragraph.  When [Sebastian] says "Um, the EFMLA and the EPFL, um, that has to do with paid, hu, normally you wouldn't get time off, but you wouldn't get paid for sick leave.  That says if you get paid for your sick leave up to two weeks, up to 80 hours of time.  But that would mean that would require that you get diagnosed with like a COVID-19 or like, you know, somebody in your family."  Knowing what you know now sitting here today, was that an accurate statement of Mr. Hartzell's rights?

> A: I don't think it was an accurate statement of his rights.

> Q: Okay.

> A: So I think that George misspoke there.  I'd like to—I would really want to listen to the recording again to make sure that it was 'wouldn't' and it's very clear.  Assuming that that is true, then I believe that George—he was probably, you know, a little confused about the exact interpretation.

(Doc. No. 31-5 at 16:14–17:13 (Beverly Depo.); *see also id.* at 23:2–7 ("I believe that George misspoke in that situation.").)

*Shore Memorial Hosp.*, Civil No. 11-5583 (JBS/AMD), 2013 WL 6080072, at *7 (D.N.J. Nov. 19, 2013) (explaining that "Courts in this Circuit have held that if [the] employers' actions would 'chill' or 'inhibit' the employees from exercising FMLA rights, a claim for interference may arise" and noting that a "jury could reasonably find that Defendant misinformed [the plaintiff] that she had no FMLA eligibility after February 2011 . . . and that such misinformation was interference with her FMLA rights"); *Rashid*, 2008 WL 2485450, at *6 ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." (quotation marks omitted)).

In addition, as discussed above, a reasonable juror could find that Hartzell was terminated after Sebastian referenced Hartzell's failure to meet the call quota, told him he was not entitled to leave, mentioned unemployment, and encouraged him to pursue that route instead. *See Erdman*, 582 F.3d at 509 (holding that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee"); *cf. Simone*, 2021 WL 22971341, at *5 (denying summary judgment in FFCRA interference case because "there is a question of material fact regarding whether [the employee] was fired or quit" during a call with his supervisor where the employee testified that he told his supervisor he could not "keep working without proper PPE" and the supervisor testified that he interpreted the conversation as the employee resigning).

Therefore, disputes of fact also foreclose summary judgment on this issue. *See Rashid*, 2008 WL 2485450, at *6 ("Rashid testified that Stypulkoski and Forcey refused to address his need for leave despite his repeated request that they do so.  Moreover, he was fired very shortly after his request for leave. Because there is sufficient evidence that a reasonable jury could

conclude that Sovereign interfered with Rashid's right to FMLA leave, there is a genuine issue of material fact and summary judgment must be denied.").

* * *

In sum, disputes of fact preclude summary judgment on Hartzell's FMLA interference claim.

### b. Retaliation

Next, we address Hartzell's claim for retaliation. "An FMLA retaliation claim arises under 29 U.S.C. § 2615(a)(2), which makes it 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA." *Capps*, 147 F. Supp. 3d at 334 (quoting 29 U.S.C. § 2615(a)(2)). An FMLA retaliation claim, unlike an interference claim, "requires proof of [the defendant's] retaliatory intent, and is therefore analyzed through the lens of employment discrimination law." *Capps*, 147 F. Supp. 3d at 336. "Accordingly, a claim based on circumstantial evidence . . . is assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green* . . . ." *Capps*, 147 F. Supp. 3d at 336. At the first step of that framework, Hartzell must put forth a prima facie case of FMLA retaliation by showing "that '(1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights.'" *Ross*, 755 F.3d at 193 (quoting *Lichtenstein*, 691 F.3d at 302) (alterations adopted). Adaptable Systems argues that Hartzell has failed to meet his burden as to the first two elements. We disagree.

Beginning with the first element, we find Hartzell invoked his right to FMLA-qualifying leave for all the reasons mentioned in connection with Hartzell's interference claim—he asked for leave to care for his children who were home because their schools were closed for the pandemic, and he mentioned paragraph 5 of the FFCRA poster. *See Grosso v. UPMC*, 857 F.

Supp. 2d 517, 542 (W.D. Pa. 2012) ("The Court of Appeals for the Third Circuit does not require that an employee actually take FMLA leave; an 'invocation of FMLA rights' is sufficient.  In order to invoke FMLA rights, the employee must give the employer adequate notice of his or her need for FMLA leave." (citations omitted)).  As for the second element, Adaptable Systems argues that Hartzell cannot show he was subject to an adverse action because he admits that he resigned voluntarily.[12]  We disagree.  As we have discussed at length in this opinion, a reasonable juror could find, after reviewing the transcript of Hartzell's call with Sebastian, that Hartzell had no intention of quitting and reasonably thought he had been terminated after he was told he did not qualify for leave and was encouraged to pursue unemployment instead.  *See Erdman*, 582 F.3d at 509 (holding that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee").

Because Hartzell has stated a prima facie case of retaliation and Adaptable Systems has not put forth a legitimate, non-discriminatory reason for terminating him, summary judgment is also inappropriate on Hartzell's FMLA retaliation claim.

\* \* \*

For those reasons, we deny summary judgment as to Count II.

### 3.      <u>Count III:  Unpaid Wages Under the FFCRA and FLSA</u>

In Count III, Hartzell seeks unpaid wages under the FFCRA.  (*See* Doc. No. 7 at p. 11.) An employer who fails to pay wages to a qualifying employee as required by § 5102 of the

---

[12] Although there is some confusion in the briefing about whether the wrongful termination falls under Hartzell's interference claim, it is more appropriately analyzed under a retaliation theory.  *See Capps*, 147 F. Supp. 3d at 336 ("Any assertion that Mondelez improperly considered his FMLA leave as a factor in his termination is more properly brought as a retaliation claim, not an interference claim.").

EPSLA is "considered to have failed to pay minimum wages in violation of section 6 of the FLSA (29 U.S.C. § 206)."  FFCRA § 5105(a)(1).  Likewise, an employer who interferes with an employee's rights under the FMLA is liable to the eligible employee for damages equal to the amount of "any wages . . . or other compensation denied or lost to such employee by reason of the violation."  29 U.S.C. § 2617(a)(1)(A).

Adaptable Systems argues that it is entitled to summary judgment on Count III for the same reasons that it is entitled to summary judgment on Hartzell's other counts.  (*See* Doc. No. 26-1 at 22 ("In Count III, Plaintiff seeks lost wages as a result of Plaintiff's alleged request for leave, which did not occur as discussed *supra.*  As Plaintiff has not established any violation of the FFCRA or FLSA, Plaintiff cannot recover damages for unpaid wages as a result." (citation omitted)).  Because factual disputes foreclose summary judgment as to Counts I and II, we likewise decline to award summary judgment on Count III.

## IV.    CONCLUSION

For the reasons discussed above, Adaptable Systems's motion for summary judgment is denied in its entirety.  An appropriate order follows.